# EXHIBIT 2

# SUPPLY AGREEMENT

This Supply Agreement (the "Agreement") dated as of the 8th day of February, 2008 is entered into by **Flexible Innovations, Ltd.**, a Texas limited partnership, having a principal place of business at 1120 South Freeway, Suite 204, Fort Worth, Texas 76104 ("FI"), and **Stickkey Security Access Pte Ltd**, a Singapore incorporated company, having its principal place of business at 103 Beach Road, #03-01, Premier Centre, Singapore 189704 ("SK").

WHEREAS, FI and SK have as of the date hereof entered into a licensing and supply relationship evidenced by a Non-Exclusive License Agreement and this Supply Agreement; and

WHEREAS, FI has developed a thin silicone rubber cast onto a dimensionally stable film ("Material"); and

WHEREAS, SK desires to purchase Material and graphics from FI on the terms and conditions set forth herein; and

WHEREAS, FI is willing to sell Material and graphics to SK on the terms and conditions set forth herein.

**NOW THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## ARTICLE 1
### Sale of Material

1.1 **Sale:** FI agrees to sell to SK Material and graphics in accordance with the specifications referenced on Exhibit A (the "Specifications"). The Specifications may be modified during the term of the Agreement upon the mutual written agreement of both parties.

1.2 **SK's Purchase Requirements:** During the term of this Agreement, and subject to the terms and conditions hereof, SK and SK's licensees shall purchase from FI one hundred percent (100%) of SK's and SK's licensees' requirements for Material and graphics.

1.3 **Restricted Use of Material:** SK and SK's licensees are restricted to the use of the Material only for the production of RFID egrips® Non-Slip Strips© aka Stickkey™.

1.4 **Monthly Report:** SK and FI shall consult with each other on at least a monthly basis to report sales forecasts, inventory levels, reorder points and production schedules; and confirm those in writing.

## ARTICLE 2
### Purchase Orders

2.1 **Purchase Orders:** All sales and purchases of Material and graphics under this Agreement shall be made by written purchase orders (each, a "Purchase Order") issued by SK or SK's licensees to FI. The Purchase Orders shall be submitted by authorized personnel of SK or SK's licensees and shall set forth the following:



(a) a statement referencing this Agreement;
(b) the quantity of Material to be delivered;
(c) the artwork for the graphics;
(d) the date of delivery; and
(e) wire transfer of funds prior to shipment.

2.2 **Terms and Conditions:** The terms and conditions governing all sales and purchases of Material and graphics under this Agreement are set forth on Exhibit B attached hereto. In case of a conflict between any of the terms contained in any such Purchase Order, or in any acknowledgment by FI of the Purchase Order, or in any other standard form documentation, and any of the terms set forth in this Agreement (including Exhibit B hereto), the terms of this Agreement (including Exhibit B hereto) shall control. No additional terms or conditions of sale other than those contained in this Agreement (except those specifically referenced in Articles 2.1 (a)-(f) above) shall be effective unless approved in writing by an authorized officer of both FI and SK.

## ARTICLE 3
### Initial Price and Price Increases

3.1 **Initial Price and Price Increases:**
(a) The initial price at which FI shall supply Material and graphics to SK and SK's licensees shall be as listed on Exhibit C.
(b) Thereafter, FI shall be able to increase the Material and graphics price only once during any twelve (12) month period, and then by no more than fifteen percent (15%) of the then current price; however, FI shall be able to increase the Material and graphics price by greater than fifteen percent (15%) provided that such increase is a direct result of the increase in the cost of Material and graphics raw materials, evidence of which shall be provided to SK.

3.2 **Effective Date of Price Increases:** New prices will become effective as of ninety (90) days after FI's original notice of a proposed price increase. SK and SK's licensees agree not to submit purchase orders for Material and graphics other than in the ordinary course of business and consistent with SK's and SK's licensees' past practices and requirements, so as to avoid any stockpiling of inventory in anticipation of a price increase.

## ARTICLE 4
### Termination

4.1 **Termination; Licenses and Conveyance:**
(a) Subject to the termination provision contained in clause (b) below, the term of this Agreement shall begin as of the date first written above (the "Effective Date") and shall continue until a date which is six (6) months after notice of termination of the Agreement is given by FI to SK hereunder. Subject to SK's compliance with the provisions of Article 3 regarding the prohibition of any issuance of Purchase Orders outside the ordinary course, any such termination shall not terminate FI's obligation to provide any Material and graphics previously ordered and/or paid for by SK prior to receipt by SK of any such termination notice.



(b) In addition to any termination of this Agreement as described in Article 4.1(a), this Agreement may be terminated at any time by written notice by one party to the other party if: (i) the other party commits a material breach of this Agreement, and such material breach is not cured within a period of thirty (30) days after written notice of termination is delivered to such other party, or (ii) a right of termination is provided by any provision of Exhibit B hereto. The right of termination provided in this Article 4.I(b) is not exclusive of any remedies to which either party may otherwise be entitled at law or in equity in the event of a breach of this Agreement.

(c) Except as otherwise provided herein, if FI terminates this Supply Agreement for reasons other than SK's breach, the License Agreement shall also be terminated.

(d) In the event of the termination of the Agreement by FI as a result of SK's breach, then the License Agreement shall also be terminated.

(e) In the event that SK terminates this Agreement, whether due to a price increase under Article 3 or otherwise, SK agrees not to use any Material supplied by any other source in conjunction with any RFID products.

## ARTICLE 5
## Miscellaneous

5.1 **Modifications/Improvements to Material:** FI shall provide SK with any revised documentation, information, test data or specifications that may have been prepared or generated in connection with any material modification or improvement in the Material.

5.2 **Limitation of Liability:** IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER FOR ANY INDIRECT, INCIDENTAL, SPECIAL, OR CONSEQUENTIAL DAMAGES (INCLUDING, WITHOUT LIMITATION, LOST PROFITS, NON-PERFORMANCE PENALTIES) UNLESS THAT PARTY HAS BEEN PREVIOUSLY ADVISED OF THE POSSIBILITIES OF SUCH DAMAGES.

5.3 **Confidentiality:** Each party shall be bound by the confidentiality provisions of Article 12 of the Technology Licensing Agreement.

5.4 **Ownership:** All drawings, plans, designs, data, specifications and other information furnished to FI by SK or prepared by FI or others at SK's request relating to the use or application of the Material and graphics purchased hereunder, including all intellectual property rights, trade secrets, and proprietary information so relating to the Material and graphics ("SK Proprietary Information") will remain the property of SK. Except as set forth above, all other drawings, plans, designs, data specifications and other information furnished by FI relating to the Material and graphics purchased hereunder, including all intellectual property rights, trade secrets, and propriety information relating to the design, manufacturing process or composition of the Material and graphics ("FI Proprietary Information") will remain the property of FI. All SK Proprietary Information and FI Proprietary Information shall be considered to be Confidential Information and shall be subject to the restrictions set forth in Article 5.3 above. All SK Proprietary Information in any form whatsoever, including copies and reproductions, will be delivered or returned to SK at SK's request. All FI Proprietary Information in any form whatsoever, including copies and reproductions, will be delivered to FI at FI's request.



5.5 **Force Majeure:** Neither party will be responsible for any failure or delay in the performance of all or any part of this Agreement caused by acts of God and nature, intervention of government, war or threat of war, conditions similar to war, acts of terrorism, sanctions, blockades, embargoes, strikes, lockouts or other similar causes or circumstances which cannot reasonably be prevented by the party whose performance is delayed. However, the party so affected shall promptly give written notice to the other party whenever such contingency or other act becomes reasonably foreseeable, and shall use commercially reasonable efforts to overcome the effects of the contingency as promptly as possible, and shall promptly give written notice to the other party of the cessation of such contingency. Neither party, however, shall be required to resolve a strike, lockout or other labor problem in a manner which it alone does not, in the party's sole discretion, deem reasonably proper and advisable. If allocation of Material and graphics becomes necessary under this Article, FI shall allocate its available production and inventories in a fair and equitable manner.

5.6 **Entire Agreement, Non-Waiver:** This Agreement, together with the Exhibits hereto, sets forth the entire understanding of the parties with respect to the manufacture by FI and purchase by SK of Material and graphics, constitutes the entire agreement between the parties with respect to the matters contained herein, and supersedes all prior oral or written representations, proposals, correspondence, discussions, negotiations and agreements. The parties hereby acknowledge that they have also entered into a License Agreement of even date herewith, and the relationships established by those agreements are to be governed by those agreements. No change, modification, waiver, agreement or understanding, oral or written, in any way purporting to waive or modify the terms of this Agreement shall be binding on either party hereto unless contained in a written document expressly described as an amendment to, waiver of or extension of this Agreement and unless such document is duly executed by both parties. A waiver by either party of any breach or failure to enforce any term or condition of this Agreement shall not in any way affect, limit or waive such party's right at any time to enforce strict compliance with that or any other term or condition of this Agreement.

5.7 **Non-Assignment; Successors:** This Agreement shall be binding upon and shall inure to the benefit of each of the parties and its respective successors and permitted assigns. Neither party may assign its rights or delegate its obligations hereunder without the prior written consent of the other party.

5.8 **Notices:** Any notice, request, demand or other communication given under this Agreement shall be in writing and shall be deemed sufficiently given:
(a) Upon the date received by the intended recipient if delivered by hand or by overnight courier, or
(b) If the sender so elects, effective five (5) days following the date deposited in the United States mail, certified with return receipt requested, postage prepaid, addressed to the recipient as follows:

**To FI:**
Flexible Innovations, Ltd.
1120 South Freeway Suite 204
Fort Worth, TX  76104
Attention: Mr. Fred Antonini



Facsimile: +1-972-767 3254

**To SK:**
Stickkey Security Access Pte Ltd
103 Beach Road, #03-01,
Premier Centre, Singapore 189704
Attention: Mr. Leonard Wee
Facsimile: +65-6338 8863

(c) Either party may advise the other of any change in address or designated person to receive such notice as provided above.

5.9 **Captions; Interpretation:** The section headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. The terms of this Agreement are the product of negotiation between the parties and are not to be construed as being drafted solely by one party, and no presumption is to arise there from in favor of either party.

5.10 **Relationship of the Parties:** The relationship of the parties created by this Agreement is solely that of seller and purchaser. Nothing contained in this Agreement shall be construed as constituting FI or SK as the franchiser, franchisee, partner, broker, joint venture or agent of the other. Each party is an independent contractor and neither has nor shall have any power, right or authorization to bind the other or to assume or create any obligations or responsibilities, express or implied, on behalf of the other or in the other's name. Each party shall be responsible for its own federal, state and local taxes.

5.11 **Trademarks:** Other than as provided under the License Agreement and that FI grants and requires SK to use the egrips® trademark on its product and packaging, and may from time to time have other requirements in writing for additional marks and/or text to be used by SK, no right or license to any name, trade name, trademark, service mark or other identity owned by either of the parties hereto shall be deemed to be granted to the other party by any provision hereof or construed from the performance of this Agreement by either party.

5.12 **Severability:** If any provision of this Agreement is deemed invalid and unenforceable by any court of competent jurisdiction or under any statute, regulation, ordinance, executive agreement or other rule of law, such provision shall be deleted or modified, at the election of the parties, but only to the extent necessary to comply with such ruling, statute, regulation, ordinance, agreement or rule, and the remaining provisions of this Agreement shall remain in full force and effect.

5.13 **Governing Law:** This Agreement shall be construed according to the laws of the State of Texas without regard to its conflicts of law provisions or any other provision of Texas law that would require or permit the application of the substantive law of any other jurisdiction to govern this Agreement.

5.14 **No Third Party Beneficiaries:** This Agreement is entered into solely between and may only be enforced by the parties hereto. This Agreement shall not be deemed to create any



rights in any third parties, including any suppliers and customers of a party, or to create any obligations of a party to any third parties.

5.15 **Counterparts:** This Agreement may be executed in counterparts, all of which taken together shall constitute one and the same instrument, and any of the parties hereto may execute this Agreement by signing any such counterpart.

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be duly executed as of the date first above written.

**FLEXIBLE INNOVATIONS, LTD.**


Name: Fred Antonini
Title: President of Antonini Enterprises, Inc.,
General Partner of Flexible Innovations, Ltd.


**STICKKEY SECURITY ACCESS PTE LTD**


Name: Leonard Wee
Title: Managing Director



# EXHIBIT A
# MATERIAL AND GRAPHICS SPECIFICATION

[See Attached]

# EXHIBIT B
## STANDARD TERMS AND CONDITIONS OF SALE

1. **PRICE**
   a) Any taxes or fees, which the Seller may be required to pay or collect, will be charged to the Purchaser.
   b) Unless otherwise stated all prices are FCA Seller's factory (INCOTERMS 2000) and do not include insurance, duties, taxes, and similar charges.
   c) All payments shall be made in United States funds.

2. **TERMS**
The terms of payment are due prior to shipment by wire transfer or credit card or net 30 days from the date of invoice with an accepted Guaranteed Letter of Credit.

3. **SHIPPING AND DELIVERY**
   a) The Seller shall have no responsibility to obtain or maintain insurance, and all responsibility of the Seller shall cease when products have been delivered to the appropriate carrier for shipment to the Purchaser, properly addressed or with the proper bills of lading attached, whether or not freight is prepaid.
   b) Unless specific shipping instructions are received from the Purchaser substantially before the shipment date, the Seller reserves the right to use its judgment in selecting the means of shipment. Additional shipping costs incurred at the request of the Purchaser will be charged to the Purchaser.
   c) Shipping of goods shall be within seven (7) days upon receipt of purchase order from the Purchaser for orders up to 100,000 pieces. Orders exceeding 100,000 pieces shall be shipped within fourteen (14) to twenty-one (21) days or any reasonable period as mutually agreed by both parties. Any delays shall be communicated to the Purchaser.

4. **WARRANTY**
   a) Seller warrants these products to be substantially free from defects in materials and workmanship. Seller will replace or repair any products which shall prove to be materially defective, providing the Purchaser shall have reasonably inspected products received and notified Seller of any apparent defects within thirty (30) days of receipt of shipment. At Seller's option the Purchaser may be credited for the price charged for the defective product in lieu of replacement or repair. This warranty is for the benefit of, and must be exercised directly by, Purchaser only, and shall not convey any rights whatsoever to any third party. Seller makes no other warranty, express or implied, and disclaims the existence of any other warranty whether of merchantability, fitness for a particular purpose, or otherwise. Seller shall not, in any event, be liable for damages in respect to the sale or use of any products sold hereunder, in any amount greater than the amount of the purchase price received by Seller for such products.
   b) Products delivered by Seller shall not be considered as defective if they substantially fulfill the Purchaser's performance requirements, or are in accordance with approved samples, specifications or drawings.
   c) No allowance will be granted for any repairs made by Purchaser without written consent of Seller.



d) Seller shall not, in any event, be liable for any consequential, incidental or special damages, punitive damages, or costs or expenses in the event of any breach of warranty or in the event of any default in any term herein or in the event of any loss, damage, injury or cost resulting from or arising out of or in respect of the product's being sold hereunder.

e) Except as Seller otherwise may agree in a separate agreement signed by its duly authorized officer, Seller makes no representations or warranties, express or implied, regarding compliance (including, without limitation, notification and/or registration) in the manufacture, distribution in commerce, processing, use, or disposal of the materials which are the subject of this order, or the constituent substances thereof, with the Toxic Substance Control Act (P.L. 94-469) or the regulations promulgated there under (or any similar federal or state statute or regulation), as said act and regulations may be amended from time to time; including in the above disclaimer, without limitation, representations and warranties regarding inclusion of said materials or substances in the various lists compiled by the U.S. Environmental Protection Agency and/or state authorities under any of the aforesaid acts and/or regulations.

5. **CLAIMS AND RETURNS**

a) No products will be accepted for credit by the Seller if they are substantially in accordance with the product specifications described in the Purchaser's purchase order.

b) All claims for shortages, differences in the products shipped, or poor quality must be made in writing within 30 days of receipt of shipment.

c) No return shall be shipped to the Seller except after securing written instructions from the Seller. Seller shall have the sole right to determine whether returned articles or parts shall be repaired or replaced. Seller agrees to assume roundtrip transportation costs for defective or nonconforming articles or parts in an amount not to exceed normal common carrier shipping charges provided, however, that if Seller's inspection discloses that the returned article or part does not require repair or replacement, Seller's usual charges will apply and the Purchaser shall assume roundtrip shipping charges.

d) Damage incurred at the Purchaser's location such as in the process of inspection, handling, and repackaging shall be the sole responsibility of the Purchaser.

6. **LIABILITY FOR LOSS, DAMAGE, OR DELAY**

The Seller shall not be liable for any loss or damage suffered by the Purchaser, resulting directly or indirectly from or through delay arising out of any of the following: fire, flood, strike, accident, civil commotion, riot or war, shortage of labor, fuel, materials or supplies, regulations, priorities, orders or embargoes, imposed by any civil or military government; or any other cause or causes (whether or not similar to the foregoing) beyond the reasonable control of the Seller.

7. **CANCELLATION, ALTERATION OR DELAY REQUESTED BY THE PURCHASER**

a) Requests by the Purchaser to cancel or alter an order or to temporarily or permanently stop work or delivery must be made in writing. Acceptance to be effective must be in writing. Seller reserves the right to accept or refuse any such request and to set the additional charges and other conditions under which a request is granted. Any such additional charges will be due and payable 30 days after notification of Purchaser by Seller.

b) All products, parts or materials ordered or held by the Seller at the Purchaser's request shall be at the risk and expense of the Purchaser. The Seller, at its option, may invoice the Purchaser for all costs and expenses resulting from such a request. Such invoices are due and payable 30 days from issuance.

8. **TOOLS, DIES, DESIGNS, DRAWINGS, JIGS, AND FIXTURES**
   a) The Seller shall retain ownership, possession and control of all tools, dies, designs, drawings, jigs, and fixtures prepared for the manufacture of products subject to any order except where other written arrangements are specifically made between the Seller and the Purchaser.
   b) The Seller shall not be responsible for problems resulting from errors in artwork, drawings, and/or specifications supplied by the Purchaser.

9. **UNDER AND OVER SHIPMENTS**
At no time shall the Seller ship any amount less than the required amount as listed in the purchase order.

10. **PATENTS, TRADEMARKS, AND COPYRIGHTS**
The Seller shall indemnify the Purchaser for damages for infringement of patents, trademarks or copyrights relating solely to products sold hereunder which are products of the Seller's design, and the Purchaser shall so indemnify the Seller for products that are not of Seller's design. No indemnity shall apply to liability resulting from the manner of use of the products by the Purchaser or from combining the products with any other items. Each party shall give the other reasonable notice of any claim or infringement to which this indemnity applies and offer to allow the other to defend any suit resulting there from; otherwise, the party to notice shall not be liable, directly or indirectly, for any damages from such infringement. Anything herein to the contrary notwithstanding, any claim for indemnification shall be subject to the limitations set forth in the last sentence of subparagraph 4.A. and in subparagraph 4.D.

11. **INSOLVENCY OF PURCHASER**
If the Purchaser shall make an assignment for the benefit of creditors or a voluntary or involuntary petition or other action in bankruptcy or for reorganization or under any other insolvency law shall be filed by or against the Purchaser or the Purchaser shall admit its inability to pay its debts or a trustee, receiver, or liquidator is appointed for any part of the assets of the Purchaser, then Seller's obligation to continue to perform hereunder immediately shall cease, unless Seller thereafter otherwise agrees in writing with the Purchaser's trustee or representative. Charges to the Purchaser shall be governed by the provisions of Paragraph 7.

12. **REPRODUCTION RIGHTS**
Drawings, specifications, reports, photographs and other data of Seller relating to this order and all proprietary rights and interests therein and the subject matter thereof shall remain the property of the Seller (which term, for purposes of this paragraph only, shall include any and all affiliates of Seller). The Purchaser agrees that it will not use the Seller's drawings, specifications, and other materials and information above mentioned for the production or procurement of products covered by this order or any similar product from any other source, or reproduces the same or otherwise appropriate them without the written authorization of the Seller. The Purchaser shall cause its employees, agents and others having access to such information to be aware of, and to abide by, the terms of this paragraph.



### 13. SALES TERMS AND CONDITIONS

No additions to or modifications of Seller's terms and conditions shall be binding upon Seller unless agreed to by Seller in a signed document executed by an authorized officer of Seller. If a purchase order or other communication from Purchaser includes any term or condition contrary to, or in addition to, the terms and conditions stated herein, Purchaser's acceptance of the products and services which are the subject hereof, after receipt of these terms and conditions from Seller, shall constitute Purchaser's complete and unconditional assent to the terms hereof notwithstanding anything to the contrary in any such earlier purchase order or communication, unless Purchaser clearly instructs Seller in writing, prior to acceptance, to cancel the order. Purchaser's communication of contrary or additional terms and conditions following acceptance of the products and services, shall be construed as an offer to supplement and/or amend Seller's terms and conditions. Such offer shall be deemed rejected unless accepted by Seller in the manner set forth in the second sentence of this paragraph.

### 14. MISCELLANEOUS

Any unenforceable provision shall be reformed to the extent necessary to permit enforcement thereof. The parties both acknowledge that damages at law may be an inadequate remedy for the breach or threatened breach of Paragraph 12 and/or 13 of these terms and conditions and that, in the event of a breach or threatened breach by a party of any provision hereof, Seller's rights and obligations hereunder shall be enforceable by injunction or other equitable remedy, in addition to and not in lieu of any rights to damages at law.



# EXHIBIT C
# PRICING

**Price Per Frame (Assortable)**

| Number of Frames (Minimum 100) | Price/Frame (USD) |
|---|---|
| 100 | $24.15 |
| 250 | $21.65 |
| 500 | $19.60 |
| 1000 or more | $17.79 |

One Time Setup per Image: USD 25
Frame Layout and Press Check per Frame: USD 175

**NOTE:** One frame equates to 56 images and all touch so that there must be only one color per row of 7.



# NON-EXCLUSIVE LICENSE AGREEMENT

This Non-Exclusive License Agreement ("Agreement") is by and between **Fred A. Antonini**, an individual, having a correspondence address of P.O. Box 101029, Fort Worth, Texas 76185 ("Antonini"), **Flexible Innovations, Ltd.**, a Texas limited partnership, having a principal place of business at 1120 South Freeway, Suite 204, Fort Worth, Texas 76104 ("FI"), and **Stickkey Security Access Pte Ltd**, a Singapore Incorporated company, having its principal place of business at 103 Beach Road, #03-01, Premier Centre, Singapore 189704 ("SK") (together the "Parties").

WHEREAS, Antonini is the sole inventor and owner of certain intellectual property related to silicone elastomer films and skins, including inventions, U.S. and international patent applications, trade secrets, and confidential information, for which applications have been made for Letters Patent, including:

(1) **U.S. Provisional Application No. 60/430,706**, filed 3 December 2002, titled "Adhesive Backed Skins and Grips for Handheld Electronic Devices," being further identified as Attorney Docket No. 0771MH-42176;

(2) **International Application No. PCT/US2003/004690**, filed 18 February 2003, titled "Adhesive Backed Skins and Grips for Handheld Electronic Devices," being further identified as Attorney Reference No. 0771MH42176P;

(3) **U.S. Application No. 10/524,367**, filed 11 February 2005, titled "Adhesive Backed Skins and Grips for Handheld Electronic Devices," being further identified as Attorney Docket No. 0771MH-42176-US;

(4) **U.S. Provisional Application No. 60/500,311**, filed 4 September 2003, titled "Silicone Elastomer Film and Method for Making Same," being further identified as Attorney Docket No. 0771MH-60032;

(5) **International Application No. PCT/US2004/006552**, filed 3 March 2004, titled "Silicone Elastomer Film and Method for Making Same," being further identified as Attorney Reference No. 0771MH-60063P; and

(6) **U.S. Application No. 10/523,942**, filed 8 February 2005, titled "Silicone Elastomer Film and Method for Making Same," being further identified as Attorney Docket No. 0771MH-60032-US;

and products, tooling, and technology covered thereby (the "Licensed Patent Rights").

WHEREAS, SK desires to non-exclusively license the Licensed Patent Rights from Antonini;

WHEREAS, Antonini desires to non-exclusively license the Licensed Patent Rights to SK;

WHEREAS, FI is the owner of all of the right, title, and interest in and to the following trademarks, trademark applications, and common-law trademark rights, including the goodwill associated therewith:

(1) **U.S. Trademark Registration No. 2,899,410** for **EGRIPS** registered 2 November 2004;
(2) foreign trademarks and trademark applications in Australia, Canada, China, the European Community, Japan, Mexico, and South Korea for **EGRIPS**;
(3) all common-law rights associated with FI's use in commerce of the mark **EGRIPS**;
(4) **U.S. Trademark Registration No. 3,071,930** for **EGRIPS TECHNOLOGY** registered 21 May 2006;
(5) all common-law rights associated with FI's use in commerce of the mark **EGRIPS TECHNOLOGY**;
(6) **U.S. Trademark Application No. 78/915,196** for **PHONE TREDZ** filed 23 June 2006;
(7) all common-law rights associated with FI's use in commerce of the mark **PHONE TREDZ**;

(8) **U.S. Trademark Application No. 77/035,029** for TREDZ filed 2 November 2006;
(9) all common-law rights associated with FI's use in commerce of the mark **TREDZ**;
(10) **U.S. Trademark Application No. 77/035,061** for **TANK TREDZ** filed 2 November 2006; and
(11) all common-law rights associated with FI's use in commerce of the mark **TANK TREDZ** (the "Licensed Trademark Rights");

WHEREAS, SK desires to non-exclusively license the Licensed Trademark Rights from FI;

WHEREAS, FI desires to non-exclusively license the Licensed Trademark Rights to SK;

NOW THEREFORE, for and in consideration of $1.00 and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the Parties, the Parties hereby agree to the terms and conditions set forth herein.

1. This Agreement shall commence upon execution by all of the Parties and shall continue until 31 December 2009, unless terminated by the Parties as set forth herein.

2. This Agreement may be terminated by either Party, with or without cause, by providing thirty (30) days written notice to the other Party.

3. Antonini hereby grants to SK a non-exclusive license to purchase, make, manufacture, use, and sell thin films and products exclusively for egrips® RFID Non-Slip Strips© aka Stickkey™ covered by the Licensed Patent Rights.

4. In exchange for the non-exclusive license granted herein, SK's licensees and sub-contractors hereby agree to not make, manufacture, use, sell, offer for sale, give away, or distribute in any way, any thin films or products covered by the Licensed Patent Rights that are extras, overruns, product returns, samples, or waste. SK's licensees and sub-contractors hereby agree to return all such extras, overruns, product returns, samples, or waste to SK or dispose of in accordance to written instructions provided by SK.

5. Antonini hereby grants to SK the right to correct, improve, and modify the Licensed Patent Rights as SK deems necessary or desirable, and SK hereby agrees that any such corrections, improvements, or modifications to the Licensed Patent Rights made during the term of this Agreement are solely owned by Antonini; however, any such corrections, improvements, or modifications to the Licensed Patent Rights made during the term of this Agreement shall be included in the Licensed Patent Rights and covered by this Agreement.

6. SK hereby acknowledges FI's right to control the quality of the use of the Licensed Trademark Rights, including the right to establish quality standards, the right to inspect the licensee's premises, the right to require samples of the goods and services, and the right to approve the licensee's packaging, advertising, and manner of trademark use.

7. SK shall not sublicense the Licensed Patent Rights to any third party without the prior written consent of Antonini.

8. SK shall not assign, transfer, or convey this Agreement, or any rights under this Agreement to any third party without the prior written consent of Antonini and FI, and any assignment, transfer, or conveyance of this Agreement, or any rights under this Agreement to any third party without the prior written consent of Antonini and FI, shall be void *ab initio*.

9. SK hereby agrees to mark any products made, used, sold, or offered for sale under this Agreement in accordance with U.S. statutory patent and trademark marking requirements.

10. SK hereby agrees to indemnify and hold Antonini harmless from any damage, claim, liability, loss, or expense, including reasonable attorneys' fees, arising out of SK's manufacture, use, sale, or offer for sale of any products covered by the Licensed Patent Rights.

11. This Agreement and all matters or issues collateral thereto shall be governed by, construed, and enforced in accordance with the laws of the State of Texas, and the Parties hereby agree that venue for any cause of action related to or arising from this Agreement shall be Tarrant County, Texas.

12. No delay or failure of either Party in exercising any rights hereunder, and no partial or single exercise thereof shall be deemed of itself to constitute a waiver of such right or any other right hereunder. No waiver shall be effective unless made in writing and signed by the Party charged with such waiver.

13. In the event that any provision of this Agreement shall be declared by a court of competent jurisdiction to be void, ineffective, unenforceable, invalid, or illegal for any reason, such provision shall be reformed to the extent necessary to make such provision valid and enforceable, and the other provisions of this Agreement shall not be effected.

14. This Agreement may be amended only by a written instrument signed by both Parties.

This Agreement is agreed to, entered into, and effective as of the date of execution of the last Party to execute this Agreement below.

**FRED A. ANTONINI**

_____
Name: Fred A. Antonini
Date: February 8, 2008


**FLEXIBLE INNOVATIONS, LTD.**

_____
Name: Fred A. Antonini
Title: President of Antonini Enterprises, Inc., its General Partner
Date: February 8, 2008


**STICKKEY SECURITY ACCESS PTE LTD**

_____
Name: Leonard Wee
Title: Managing Director
Date: February 8, 2008